**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

LATISHA A.,[1]
    Plaintiff,

v.                                                   Civil No. 3:20-cv-00487 (HEH)

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,
    Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits and supplemental security income under the Social Security Act (the "Act"). Plaintiff, at the time of her alleged onset date, was a forty-one-year-old former insurance call center representative who suffers from migraines, idiopathic intracranial hypertension ("pseudo tumor"), and complications from back and brain surgeries. (R. at 13, 189-190.) Plaintiff contends that her impairments render her unable to work. (R. at 190.)

On April 4, 2019, an Administrative Law Judge ("ALJ") denied Plaintiff's application for disability benefits and supplemental security income. (R. at 10.) This matter comes before the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.
[2] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Kilolo Kijakazi should be substituted for former Commissioner Andrew M. Saul as the defendant in this matter.

1

Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[3]

Plaintiff now seeks review of the ALJ's decision, arguing that the ALJ erred in evaluating the opinion of Dr. David Geckle ("Dr. Geckle"). (Pl.'s Brief in Supp. of Mot. For Summ. J. 6, ECF No. 17 ("Pl.'s Mem.").) For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 16) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 18) be DENIED and the final decision of the Commissioner be VACATED and REMANDED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits and supplemental security income on May 2, 2017, alleging disability beginning August 8, 2016. (R. at 13.) The Social Security Administration denied Plaintiff's claim on October 4, 2017, and again upon reconsideration on March 1, 2018. (R. at 13, 55-63, 66-75.) Plaintiff requested a hearing before an ALJ, and a hearing was held on February 21, 2019. (R. at 29-59, 108.) On April 4, 2019, the ALJ issued a written opinion denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 13-22.) On May 20, 2019, Plaintiff requested review of the ALJ's decision. (R. at 5.) On April 21, 2020, the Social Security Administration Appeals Council denied Plaintiff's request and rendered the ALJ's decision as the final decision of the Commissioner. (R. at 1-5.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

## II. STANDARD OF REVIEW

This Court upholds an ALJ's Social Security disability determination if: "(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (citing 42 U.S.C. § 405(g) and *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015)). "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Pearson*, 810 F.3d at 207 (internal quotation marks omitted). Substantial evidence thus requires more than a scintilla of evidence, but less than a preponderance of the evidence. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Between these two evidentiary thresholds lies a "zone of choice" where the ALJ's decision can go either way without interference by the courts. *See Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir. 1988)). "'In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment' for the ALJ's." *Arakas*, 983 F.3d at 95 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).

In considering the decision of the ALJ based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If substantial evidence in the record supports the ALJ's findings as to any fact, it is binding on the reviewing court regardless of whether the court disagrees with such findings. *See Hancock*, 667 F.3d at 476. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The court must reverse the decision if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law. *See id*.

## III. FACTUAL BACKGROUND

### A. Plaintiff's Background.

Plaintiff is a high school graduate, is married, and has three children. (R. at 33, 190.) She previously worked in customer service, emergency room registration, insurance, homecare, and the service industry. (R. at 47-48, 190, 199.) She has been unemployed since August 8, 2016, when she last worked as a call center representative for Anthem Blue Cross Blue Shield. (R. at 200.)

### B. Medical Evidence.

Plaintiff reports a history of headaches and associated neck pain, upper back pain, and visual impairments since 2015. (R. at 263, 265, 315.) She also suffers from severe osteoarthrosis and spine disorders. (R. at 71.) Plaintiff treated with her neurologist, Dr. William W. Campbell Jr. ("Dr. Campbell"), who determined that she suffered from a pseudotumor cerebri. (R. at 267.) On September 30, 2015, Plaintiff had a follow up appointment with Dr. Campbell to discuss her migraines. (R. at 265.) She reported stable vision and fewer strong migraines. (R. at 265.) However, on December 12, 2015, Plaintiff presented at the emergency room complaining of migraines and a "knot" on the right side of her neck. (R. at 315.) The knot was determined to be an infected lymph node. (R. at 318.)

On January 5, 2016, Plaintiff went to the Retina Institute of Virginia complaining of black spots in her vision. (R. at 474.) It was determined that Plaintiff had mild pallor to both optic nerves and retinal flap tears. (R. at 477.) Plaintiff treated with Dr. Campbell again on January 6, 2016, and complained of having headaches all day, every day. (R. at 263.) Dr. Campbell determined that the pseudotumor likely caused her other symptoms, including blurred vision with intermittent blind spots, double vision, tinnitus, decreased memory, poor balance, tingling, and weakness in her extremities. (R. at 409-410.) She also continued to suffer from poor appetite, low energy levels,

and paresthesia. (R. at 261-262.) Dr. Campbell referred Plaintiff to a neurosurgeon to discuss a lumbar-peritoneal shunt. (R. at 264.) Dr. Geckle performed the lumbar-peritoneal shunt procedure on March 10, 2016. (R. at 426, 431.)

Although Plaintiff initially reported "significant" improvement after the surgery, by July 2016 she reported a return of the "severe and migrainous" headaches she experienced prior to her surgery. (R. at 365, 384, 505.) She received "several lumbar shunts" over the following year, each of which failed and were subsequently "converted to a ventricular shunt." (R. at 365, 467, 486, 524.) Plaintiff continued to have symptoms after that surgery, including vision and balance issues, headaches, poor balance, weakness, light sensitivity, tinnitus, nausea, difficulty concentrating, and back pain. (R. at 484, 490, 499-500.) Dr. Geckle cautioned Plaintiff to be careful about her activity. (R. at 496.) Dr. Geckle determined that Plaintiff's only option was to return to the lumbar-peritoneal shunt. (R. at 484.) Her last surgical shunt was on February 16, 2018. (R. at 721.)

**C. Plaintiff's Testimony.**

Plaintiff testified that her migraines prevent her from participating in daily activities. (R. at 34.) For example, getting out of bed while experiencing a migraine is difficult because she struggles to lift her head and is highly sensitive to light. (R. at 34.) She spends a typical day in bed because it is quiet, and her oldest son assists her when he is not at work. (R. at 41.) She accompanies her son to the store on days when she feels "like getting up [;] if not, he'll just go." (R. at 44.)

Plaintiff testified about her chronic arthritis in her knees and back but acknowledged that the primary issue for her were the headaches and migraines. (R. at 39.) She testified that she experiences one migraine "just about every single day" with varying pain levels, and sometimes has "rounds of headaches" that last three or four days at a time. (R. at 36, 42.) She experiences

"constant pain all the time," feels fluid "swishing around" in her head and hears constant ringing in her ears. (R. at 36.) To cope with the pain, she takes hydrocodone three times a day as well as Sudafed, Excedrin Migraine, Extra Strength Tylenol, and Motrin. (R. at 37.) Plaintiff also takes Diamex to reduce the fluid, with minimal improvement. (R. at 37-38). On a typical day when she takes her pain medication, she rates her pain at an eight or eight-and-a-half out of ten. (R. at 40.)

Plaintiff also discussed her eyesight and reduced field of vision. (R. at 38.) She told the ALJ that she has irreparable nerve damage and risks losing her vision altogether if the pressure from the spinal fluid cannot be controlled. (R. at 38.) While she has a driver's license, Plaintiff does not trust herself to drive because of her poor eyesight. (R. at 44.) At most she drives only once a week, and she does not drive at night. (R. at 44.) Plaintiff testified feeling depressed that she cannot participate in her church to the extent that she could before her eyesight worsened. (R. at 39). For instance, she sings psalms and reads passages as an elder in her church, but her vision precludes her from reading her Bible. (R. at 39.)

Plaintiff testified that she rarely goes downstairs during the day and keeps food in a small refrigerator in her room. (R. at 41, 45.) She finds it difficult to eat because she feels nauseated. (R. at 45.) She laments not being able to "get up and clean [the] house," decorate, dust, and sweep the floor. (R. at 45.) Plaintiff testified that she had not seen her three-and-a-half-month-old grandson more than three or four times because of her headaches and pain. (R. at 45-46.)

**D. Vocational Expert's Testimony.**

After hearing testimony from Plaintiff, the ALJ examined a vocational expert. (R. at 46-54.) The vocational expert listened to Plaintiff's testimony regarding her work history and asked Plaintiff to clarify some of her past positions. (R. at 46-49.) The vocational expert discussed Plaintiff's previous employment and the exertional levels of some of the positions. (R. at 47-54.)

The ALJ then asked the vocational expert about hypothetical situations involving a person with the same age, education, limited exertion and duration of continuous work levels, and limited work environments. (R. at 50-52.) The vocational expert testified that Plaintiff would be able to continue her past work as customarily performed with the limitations articulated in the ALJ's hypothetical. (R. at 50-51.) The vocational expert testified that a hypothetical person matching Plaintiff's limitations, age, and education would not be able to find available work in substantial numbers in the national economy if the individual would be off task fifteen percent or more in the normal workday. (R. 51-52.)

## IV. THE ALJ'S DECISION

On April 4, 2019, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 13-22.) The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 15-22.) *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

According to those regulations, at step one, the ALJ looks at the claimant's current work activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. *See id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. *See id*. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given his residual functional capacity. *See id*. §§

7

404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

In the instant case, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from her amended alleged onset date of May 18, 2017. (R. at 15.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "osteoarthritis of the thoracic spine with spondylosis; bilateral knee osteoarthritis; pseudotumor cerebri, status post shunt procedures; migraines/headaches; bilateral peripheral retinal degeneration; and obesity." (R. at 15.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.)

The ALJ determined Plaintiff's residual functional capacity based on an evaluation of the entire record. (R. at 16-20.) Based on this evidence, the ALJ determined that Plaintiff retained the ability to perform light work with the following limitations:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: occasionally lift up to 20 pounds and frequently up to ten pounds; can sit six hours, and stand, and walk for six hours; limited to frequent climbing of ramps or stairs, balancing, crouching, or crawling; limited to occasional climbing of ladders, ropes, or scaffolds; limited to occasional exposure to weather and vibration; entail no exposure to unprotected heights, moving mechanical parts; limited to frequent foot control operations with the right lower extremity; limited to moderate noise exposure (such as business office, department stores, grocery stores, and light traffic); can avoid ordinary hazards (such as boxes on the floor, doors ajar, or approaching people or vehicles); and bilateral field of vision is limited to frequent.

(R. at 16-17.) The ALJ explained that he determined Plaintiff's residual functional capacity after summarizing the evidence in the record and finding that the objective medical findings in the

record did not support Plaintiff's claimed levels of severity. (R. at 16-20.) Based on this determination, the ALJ concluded at step four that Plaintiff's limitations prevented her from performing any of her past relevant work. (R. at 20.)

At step five, the ALJ considered whether Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 21-22.) The ALJ weighed the testimony of the vocational expert, who opined that Plaintiff could perform the requirements of occupations such as storage facility rental clerk and cashier. (R. at 21-22, 35.) The ALJ determined that, given Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff can make a successful adjustment to other work that exists in significant numbers in the national economy. (R. at 21-22.) The ALJ, therefore, concluded that a finding of "not disabled" was appropriate. (R. at 22.)

## IV. ANALYSIS

Plaintiff's appeal to this Court challenges the ALJ's finding of "not disabled" and argues that the ALJ erred in evaluating the medical opinion evidence of Dr. Geckle. (Pl.'s Mem. at 6-12). Plaintiff contends that the ALJ's reasoning for finding Dr. Geckle's opinion unpersuasive was not supported by substantial evidence. (Pl.'s Mem. at 6). Defendant argues that the ALJ correctly evaluated the medical opinion evidence as part of his residual functional capacity assessment and pointed to substantial evidence in the record to support his findings. (Def.'s Mem. at 10). For the reasons set forth below, the ALJ erred in denying Plaintiff's application for benefits.

Under the Social Security Administration regulations, the ALJ must consider each medical opinion in the record. 20 C.F.R. §§ 404.1520c, 416.920c ("We will articulate in our determination or decision how persuasive we find all of the medical opinions . . . in your case record."). The regulations define a medical opinion as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the [following] abilities . . .
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id*. §§ 404.1513(a)(2), 416.913(a)(2). A medical opinion does not include "judgments about the nature and severity of [the claimant's] impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." *Id*. § 404.1513(a)(3) (defining these categories of information as "other medical evidence").

Under the regulations,[4] the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. *Id*. §§ 404.1520c, 416.920c(a), (b),

---

[4] Because Plaintiff filed her disability claim after March 27, 2017, Section 416.920c, which sets forth revised rules regarding the assessment of medical opinion evidence, applies here.

10

(c)(1)–(5). Supportability and consistency are the "most important" factors, and the ALJ must discuss how he considered these factors in the written opinion. *Id*. § 416.920c(b)(2).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are," the "more persuasive the medical opinion []" will be. *Id*. § 416.920c(c)(2). Similarly, for consistency, "[t]he more consistent a medical opinion []" is with "evidence from other medical sources and nonmedical sources," the "more persuasive the medical opinion[]" will be. *Id*. § 416.920c(c)(2).

The ALJ may explain his consideration of the other factors but is only required to do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency. *See id*. § 416.920c(b)(3). In that situation, the ALJ must then articulate the remaining factors and their application to the persuasiveness of the medical opinion. *See id*.

On February 11 2019, Dr. Geckle submitted a Medical Source Statement in which he opined that Plaintiff: (1) would be off task twenty-five percent of the day; (2) could sit for thirty minutes before needing to change positions; (3) could stand for thirty minutes before needing to change positions; (4) could sit, stand, or walk for less than two hours per day; (5) could constantly lift and carry less than ten pounds; (6) could frequently lift and carry ten pounds; (7) could occasionally lift and carry twenty pounds; (8) could not lift and carry over fifty pounds; (9) would not need to use any assistive devices; (10) could frequently use her right hand for reaching, handling, fingering, and feeling; (11) could occasionally use their right hand to push and/or pull; (12) could frequently use their left hand for reaching, handing, fingering, and feeling; (13) could occasionally use their left hand to push and/or pull; (14) could frequently use their right foot to operate foot controls; (15) could frequently use their left foot to operate foot controls; (16) could occasionally climb, balance, stoop, kneel, crouch, and crawl; (17) could never be exposed to

unprotected heights, moving mechanical parts, pulmonary irritants, or vibrations; (18) could occasionally be exposed to operating a motor vehicle, humidity and wetness, extreme cold, and extreme heat; (19) could only tolerate exposure to quiet noises; (20) could perform activities like shopping; (21) could travel without a companion for assistance; (22) could walk a block at a reasonable pace on rough and/or uneven surfaces; (23) could climb a few steps at a reasonable pace with use of a single hand rail; (24) could use standard public transportation; (25) could prepare a simple meal and feed themselves; (26) could care for their personal hygiene; (27) could sort, handle, and use papers/files; and (28) has been limited or will be limited by these limitations for at least twelve consecutive months. (R. at 762-766.)

The ALJ concluded that Dr. Geckle did not provide support for his assessed limitations, nor are they supported by his own treatment records. (R. at 20.) The ALJ found that Dr. Geckle's assessed limitations "significant[ly] overstate" Plaintiff's ability to walk or stand for long durations of time because his examination notes indicate that Plaintiff had "no abnormalities of gait." (R. at 20.) The ALJ did not find Dr. Geckle's assessment of Plaintiff's difficulty with concentration, memory problems and weakness to be consistent with his own treatment records, which do not indicate limitations in those areas. (R. at 19-20.)

This Court finds that the ALJ erred as the ALJ's evaluation of Dr. Geckle's opinion fails to explain how the ALJ concluded that Dr. Geckle's opinion was unsupported by, and inconsistent with, the record. The ALJ makes two statements regarding Dr. Geckle's opinion and its relation to the record. (R. at 20.) First, without any citation the ALJ states that Dr. Geckle gave no reasoning for walking/standing limitations when there was no abnormality of the Plaintiff's gait. (R. at 20.) Second, the ALJ states that Dr. Geckle's "most recent treatment records indicate, on review of symptoms, that difficulty with concentration, memory problems and weakness were not present."

12

(R. at 20, *citing* R. at 710-729.) Such citation falls short of explaining adequately how Dr. Geckle's opinion is inconsistent with and unsupported by the record.

The ALJ does not address that there is support within Dr. Geckle's records for the opinions articulated within the Medical Source Statement. For example, Dr. Geckle's records state that Plaintiff presented with memory problems (R. at 486, 507), poor balance and weakness (R. at 492, 499, 503, 507, 712), and difficulty with concentration. (R. at 497, 507, 541.) Without further discussion by the ALJ, there is no way to meaningfully review how the ALJ considered supportability and consistency of Dr. Geckle's record. 20 C.F.R. § 416.920c(b)(2).

Thus, the ALJ's general citation to an exhibit, without more, does not allow the Court to meaningfully review the ALJ's conclusion that Dr. Geckle's opinion was unpersuasive. *See Monroe*, 826 F.3d at 191. The ALJ's evaluation of Dr. Geckle's opinion fails to build "an accurate and logical bridge from the evidence to her conclusion." *Monroe*, 826 F.3d at 1898 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Accordingly, the ALJ erred in evaluating Dr. Geckle's opinion.

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 16) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 20) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge Henry E. Hudson and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: October 25, 2021